## WILLIAM L. KLINE AND EDWARD WESTEN, Appellants, v. ISAAC A. HEDGES.

**Division One, June 14, 1910.**

1. **ACCOUNTING: Concealment: Profits on Purchase of Stock: Partners: Sale.** Where plaintiffs' testimony shows that they and defendant were each to put up $20,000 and defendant was to purchase 510 shares of stock and it was to be divided equally between the three of them, and he bought the stock and paid only $40,000 for it, and took one-third of it in his own name and turned over to them only the remaining two-thirds and kept secret from them that he had paid only $40,000 for the whole 510 shares and they sue for two-thirds of the $20,000 he led them to believe he was putting up for his third of the stock; and defendant's testimony is to the effect that he owned 51 shares of the stock and had an agreement to purchase the 460 shares at $41,400, and sold to plaintiffs 340 shares at $40,000, and they entered into a written agreement with him to purchase at that price, and provided therein that the agreement was to be void unless defendant delivered the 340 shares by a certain date, and that was done, and all the parties were *sui juris*, the burden was on plaintiffs to establish their case, and the preponderance of the evidence is that the three were not partners, but that defendant sold 170 shares of stock to each of plaintiffs at $20,000.

2. **———: Written Contract: Purchase of Stock: Fraud.** Where there was a written contract to the effect that defendant was to purchase 510 shares of stock and pay for the same and have 340 shares issued to plaintiffs and deposited with a trust company for their use before they were obliged to pay for it, the law presumes that all the agreement was reduced to writing, which must stand and be enforced as written unless impeached for fraud or on some other equitable ground; and absent these impeachments, an understanding between plaintiffs and defendant that the three of them were, as partners, to put up $20,000 each and together buy the 510 shares and share in the profits growing out of the purchase by defendant at a less sum, cannot be enforced, in the face of that written agreement.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor*, Judge.

AFFIRMED.

*Clifford B. Allen* and *Jacob Oppenheimer* for appellants.

(1) "Exhibit A," signed by defendant and filed with, and made a part of, his amended answer, containing the following stipulation: "And whereas it is the desire of all three parties to this contract that they should control and direct the affairs of said corporation, and that they should each be equally interested in said corporation," is a conclusive admission of the existence of a confidential relation between them. (a) Associates engaged in a common enterprise for their mutual benefit have the right to demand and expect from each other good faith in all that relates to their common interest, and one cannot be permitted to take to himself a secret or separate advantage to the prejudice of the others. Land Co. v. Case, 104 Mo. 572; Seehorn v. Hall, 130 Mo. 260; Exter v. Sawyer, 146 Mo. 321; Davis v. Hoffman, 167 Mo. 573; Campbell v. Hoff, 129 Mo. 324; Tinker v. Kier, 195 Mo. 183; Garrett v. Wannfried, 67 Mo. App. 437; Hess v. Draffen, 99 Mo. App. 580; King v. White, 119 Ala. 432; Bloom v. Lofgren, 64 Minn. 1; Walker v. Land Co., 139 Fed. 610; King v. Wise, 43 Cal. 628; Emery v. Parrott, 107 Mass. 95; Iler v. Griswold, 83 Ia. 442; Schoufe v. Griffiths, 4 Wash. 161; Getty v. Delvin, 54 N. Y. 403; Bunn v. Schnellbacher, 163 Ill. 328; Crater v. Binninger, 33 N. J. L. 513; Franey v. Warner, 96 Wis. 222. (b) An admission in the pleadings is conclusive. McAdow v. Miltenberger, 75 Mo. App. 357; Weil v. Posten, 77 Mo. 284; Kuhn v. Weil, 73 Mo. 213; Bruce v. Sims, 34 Mo. 246; Wilson v. Albert, 89 Mo. 537. (2) From the time defendant first approached plaintiffs, about February 17, 1903, to interest them in the syndicate to control the Odeon, he occupied a fiduciary relation to them, and from that time it was not competent for him to purchase the stock for one price and dispose of it to the members of the syndicate at an ad-

vance, without full disclosure of the facts. Land Co. v. Case, 104 Mo. 572; Seehorn v. Hall, 130 Mo. 260; Exter v. Sawyer, 146 Mo. 321; Davis v. Hoffman, 167 Mo. 573; Franey v. Warner, 96 Wis. 222; Densmore v. Densmore, 64 Pa. St. 43; Bloom v. Lofgren, 64 Minn. 1. (a) Defendant did not acquire the Swasey stock until the day following the one on which "Exhibit A" was signed. He was therefore precluded from making any profit thereon at the expense of his associates. Exter v. Sawyer, 146 Mo. 321; Davis v. Hoffman, 167 Mo. 582. (b) Even though defendant may have reached an agreement with Swasey for the purchase of the stock, on the day, and before "Exhibit A" was signed, still by associating himself with the plaintiffs he lost the right to profit thereby. Davis v. Hoffman, 167 Mo. 582; Hayward v. Leeson, 49 L. R. A. 725; Hinton v. Ring, 111 Ill. App. 373; Walker v. Land Co., 139 Fed. 610; 2 Pomeroy's Eq. Jur., p. 395; 1 Thompson on Corps., sec. 458; Franey v. Walker, 96 Wis. 222. (3) "Exhibit A" may have expressed a sale from defendant to plaintiffs, but it also, not only by implication but by its terms, expressed an agreement that the plaintiffs and defendant were to become co-investors in a mutual venture. Hence, it was not only no evidence that the parties dealt at arm's length, but conclusive evidence that they were quasi-partners. 2 Pomeroy on Eq. Jur., p. 395; 1 Thompson on Corps., sec. 458; 2 Lindley on Partnership, pp. 497, 723; Garrett v. Wannfried, 67 Mo. App. 441. (4) If "Exhibit A" evidenced a sale of stock from defendant to plaintiffs, still it was something more. The organization of the syndicate composed of plaintiffs and defendant, and the purchase of the stock, were dependent upon each other. Cases cited under point 2. (5) Upon no possible theory can "Exhibit A" be interpreted as a contract of sale between parties dealing at arm's length. Upon the pleadings alone a decree ordering defendant to account should have been ren-

dered. The conclusion of the trial court that "Exhibit A" turned the weight of evidence against plaintiffs' contention is error. (6) The plaintiffs and defendant were not on an equal footing. They did not deal at arm's length. The plaintiffs had a right to rely upon defendant's statements, whether they were as to price or value. Tinker v. Kier, 195 Mo. 183; Hess v. Draffen, 99 Mo. App. 586; Garrett v. Wannfried, 67 Mo. App. 437; Cottrill v. Krum, 100 Mo. 405; McBeth v. Craddock, 28 Mo. App. 396; Cahn v. Reid, 18 Mo. App. 116. (7) Courts of equity have jurisdiction over all suits for the purpose of compelling an accounting, and the existence of any confidential or fiduciary relation is sufficient to invoke such jurisdiction whenever the duty arising out of such relation rests upon one of the parties to render an account to the other. Tompkins v. Hollister, 60 Mich. 470; Franey v. Warner, 96 Wis. 222; Marston v. Gould, 69 N. Y. 220; Geitz v. Devlin, 70 N. Y. 504; Burbank v. Dennis, 101 Cal. 90; Colonial Co. v. Mortgage Co., 44 Fed. 219; Tel. Co. v. Tel. Co., 125 Fed. 342; Hutchinson v. Leroy, 113 Fed. 206; Hubbard v. Lucas, 71 Mo. 505; Berlien v. Bieler, 96 Mo. 491; Creath v. Distilling Co., 70 Mo. App. 301; Grumley v. Webb, 44 Mo. 444. (8) No words in a written contract, and no negligence of a vendee, will protect a vendor from the result of misrepresentation or aggressive concealment. Moncrief on Fraud, p. 352; Griffin v. Lumber Co., 53 S. E. 309.

*Jeptha D. Howe* and *Alphonso Howe* for respondent.

(1) It is the duty of the appellate court to carefully weigh and fully review all the evidence developed at the trial of an equity cause, for the purpose of ascertaining whether the decree and findings were in harmony with good conscience and the well-settled

principles of equity jurisprudence. But that does not mean that it will not defer somewhat to the findings of the chancellor. Where there is a conflict in the evidence, it will accord a proper deference to his finding, especially where the testimony is oral and the witnesses were before him. Tinker v. Kier, 195 Mo. 183; Carter v. Dilley, 167 Mo. 571; Dunivan v. Dunivan, 157 Mo. 160. The burden of proof rests upon the plaintiff, and where the appellate court is not satisfied that the preponderance of the evidence is against the finding of the learned trial judge on the issue, the finding will not be disturbed. Forster v. Byrd, 119 Mo. App. 168; Dunivan v. Dunivan, 157 Mo. 157; Rollins v. Rollins, 102 Mo. 563. (2) In the deal with plaintiff, Hedges stood at arm's length. He made the purchase from Swasey independently and on his own hook and sold the stock to Kline and Westen, as he had a perfect right to do. Any man can take an option on stock in any concern for any price and go out and sell it at any price that he can get for it; provided, he makes no misrepresentations as to its value. Appellants admit that they received what they paid for and realized a handsome profit on their investment. Any number of men, who are the owners of any kind of property, may form an association with others and sell that property to the association at any price that may be agreed upon between them, no matter what it may have originally cost; provided, there be no fraudulent representation by the vendors to their associates. They are not bound to disclose the profits which they may realize by the transaction. There is no confidential relation between the parties and they deal at arm's length with each other. Lungren v. Pennell, 10 Week. N. & C. 297; Oil Co. v. Densmore, 64 Pa. St. 43; Gotcher v. Haefner, 107 Mo. 270; Huetteman v. Viesselmann, 48 Mo. App. 582. Trusts in personal property cannot be established by loose, vague and indefinite expressions or statements of the

parties. Kramer v. McCaughey, 11 Mo. App. 426; Burns v. Bangert, 16 Mo. App. 22; Forrester v. Moore, 77 Mo. 651. Parol evidence, in order to establish a resulting trust, must be clear, strong and unequivocal, and so definite and positive as to leave no room for reasonable doubt in the mind of the chancellor as to the existence of the trust. Burdett v. May, 100 Mo. 13; Allen v. Logan, 96 Mo. 591; Roberts v. Walker, 101 Mo. 597; Lewis v. Ziegler, 105 Mo. 604; Taylor v. Von Schraeder, 107 Mo. 206; King v. Isley, 116 Mo. 155; Bradley v. Bradley, 119 Mo. 58; McFarland v. La-Force, 119 Mo. 585; Reed v. Painter, 129 Mo. 674. There should be no room for a reasonable doubt as to the facts relied upon to establish a resulting trust. A mere preponderance of evidence is not sufficient. Ringo v. Richardson, 53 Mo. 385; Kennedy v. Kennedy, 57 Mo. 73; Adams v. Burns, 96 Mo. 361; Brewing Co. v. Dold, 45 Mo. App. 603.

WOODSON, J.—This suit was brought by plaintiffs against the defendant for an accounting and for the recovery of their proportional parts of certain secret profits, alleged to have been made by the latter, growing out of a joint deal entered into between the three to purchase a majority of the capital stock of the Grand Avenue Masonic Temple and Odeon Building Company, situate in the city of St. Louis. The secret profits alleged to have been made by defendant are stated to have been $20,000.

The cause was tried before the court, which resulted in a finding of facts and decree of the court in favor of the defendant. After moving unsuccessfully for a new trial, the plaintiffs duly appealed the cause to this court.

A proper disposition of the legal propositions presented for adjudication does not call for a statement of the pleadings, and for that reason they are omitted from the statement of the case.

The record in this case is quite voluminous, the evidence alone covering something over two hundred pages of solid printed matter. This will prevent us from stating more than a comparatively brief summary of the more important portions of the testimony of each witness.

The plaintiffs' evidence tended to show that defendant called upon them and stated that he could secure control of 510 shares of the stock of the Odeon Company for $60,000, and if they would each contribute $20,000, he would contribute $20,000, towards the purchase price of said stock, and through the ownership of said stock defendant was to be elected president, and plaintiffs directors, and the three of them were to direct and control the corporation during the World's Fair.

Westen, on cross-examination, testified that defendant said: "Westen, I have got an elegant proposition. I can buy the controlling interest in the Odeon for $60,000. . . . . I have not got so much money; if you want to put up $20,000, and Kline $20,000, I put in $20,000, and that is sixty."

"Q. Was not the $60,000 mentioned as the basis for the valuation of the two interests—of the three interests? A. No; when he told me— Q. (Interrupting) I am asking you if it was not the fact that it was reached as a basis for your calculation? A. No. Q. It was not? A. No; Q. You thought that he was going out in the market and going to buy 510 shares of stock and pay $60,000 for it? A. That is about the size of it. Q. That is what you thought? A. Yes, sir. Q. That is what you understood? A. That is the idea. Q. That is what he told you? A. What he told me? Q. Yes. A. I can tell you only what I have mentioned so often; he came and told me that he could buy fifty-one shares [per cent] of the Odeon stock for $60,000; 'I will put up $20,000, you put up $20,000, Kline put up $20,000. We can each put up $20,000, that makes the

$60,000, when we go together on that basis I will be president of the Odeon, receive a salary of $3,000.' That is the whole circumstance. Q. Then you understood that he was going out in the market, going to buy stock, 510 shares? A. I didn't bother what he will do on going out. Q. Is it not the fact—it is the fact, that you were figuring more upon the valuation of the stock, you had that in mind, thought of the worth naturally more than how he was going to get the stock? A. Well, I was always under the impression if he goes and buys that stock that he is to put up his $20,000 just as well as we. Q. That was an impression only; you had no talk about it. He didn't tell you anything of the kind? A. He told me that he will put up $20,000.''

Plaintiff Kline's testimony was substantially the same as that of Westen and corroborated him as to most of the details of the transaction.

While defendant was making this agreement with plaintiffs he was also negotiating with W. A. Swasey, who was the president of the Odeon Company, for the acquisition of the 460 shares. On March 2, 1903, he got Swasey to reduce his price from $46,000 to $40,000, and to agree to accept in payment $20,000 in cash and 100 shares of Colonial Trust stock, valued at $200 per share.

Swasey testified on behalf of plaintiffs.

''Q. Will you state what Mr. Hedges said on that subject to you during the negotiations? A. He stated that he and two other gentlemen wanted to get the controlling interest of the Odeon stock. He wanted to know what I would take for mine. Q. What else did he state, if you remember—go ahead and state the negotiations briefly, what the result was? A. Well, I told him that the Odeon had gotten on its feet at that time, and everything looked very prosperous. And I didn't care to sell out unless at par. He said it would be impossible for him to get par for the stock, but he

would see what he could get, and let me hear from him again. My recollection is he came in two or three times regarding the matter, and each time he stated that he couldn't get as much as I thought the stock was worth, and he finally made me an offer for it, for the stock I owned, and the stock I controlled. He was to pay $41,000.00.''

On cross-examination Swasey testified: ''Q. What led you to understand anything different? A. Because he told me that he had two partners. Q. That he had two partners? A. Yes, sir. He said, 'I am going into this thing with two other gentlemen. We want to get the control of that stock. I am going to put in what I have got and we are going to divide up on this thing.' Q. Now, Mr. Swasey, isn't this the way the matter was presented to you, that Mr. Hedges and some other parties were desirous of getting control of that theater and that he was going to sell part of the stock to the other parties—part of this stock was going to be sold to the other parties, Captain Laird and others? A. No; I understood the three of them were buying it together. Q. Well, were your dealings with Hedges in any way conditioned upon what he did with the stock? A. I understood that he wouldn't make the deal with me unless these other gentlemen agreed to what his negotiations were and that he had to have time to see if they would buy. I understood it was three parties, including Hedges. He had to find out from them whether they would buy the stock at figure stated. Q. You understood that he was disposing of part of the stock to somebody else? A. I didn't understand that he was disposing of the stock at all. He was taking it; I supposed he was taking it representing each of the three parties, and I didn't care what he represented as long as I got my pay. Q. But you paid no particular attention to what Hedges was doing and didn't care what he was doing? A. Yes, sir; I knew that he was getting money and

getting a great deal of stock from other people. He repeatedly told me he had to get it from other people and as soon as he could it would be done. Q. The knowledge that he conveyed to you was that they were simply going in with him, going on the board? A. The knowledge he conveyed to me was that he had found two other parties who were going in with him and control the stock of the Odeon Company? Q. He didn't convey any idea to you that they would buy this stock from you? A. Yes, sir. Q. What did he say to you? A. Well, the way—I forget his words, but the impression it left on my mind— Q. I would like to get the words as near as you can? A. He said, 'I have interested two of my friends in this matter and they are ready; they believe that this is a good thing if I will take hold of it and take the presidency, they will take me up, and I have told them that I will go in with them if we can get control—get hold of the controlling interest of that stock, and I want to see what you will take for it.' "

The evidence further tended to show that defendant owned fifty shares of the stock at the time he made the agreement with plaintiffs to go into this enterprise. He then purchased of Swasey and his associate four hundred and sixty shares more for the sum of $40,000, making a total of five hundred and ten shares, which was fifty-one per cent of the capital stock of the company. That each of the plaintiffs paid to defendant $20,000, and each received in return therefor one hundred and seventy shares of said stock. That the plaintiffs never learned the details of the transactions had between defendant and Swasey regarding the purchase of this stock until about three years subsequent to the date of the purchase and a few months prior to the institution of this suit.

Defendant's evidence tended to show that sometime prior to February 16, 1903, defendant conceived the plan of securing a control of the majority of the

stock of that company with a view to reorganizing the company, becoming its president and putting in force a policy which he expected would be profitable for the stockholders during the World's Fair year. Defendant's evidence further tended to show, and he testified, that he was one of the original incorporators of the Odeon Company, and certificate No. 9 for fifty shares was issued to him as such, January 24, 1900, and receipted for by him; that he continued to own that fifty shares until the final dissolution and winding up of the Odeon Company.

"Q. You were acquainted with W. Albert Swasey? A. Yes, sir. Q. Now, I will ask you if you had any dealings with him relative to acquiring that stock? A. I took an option from W. Albert Swasey on the 16th of February, 1903, for 460 shares in his name and his wife's. Q. Do you remember the price you were to pay for that? A. Ninety cents a share—ninety cents on the dollar. Q. For the 460 shares $41,400? A. $41,400 and the option run thirty days. . . . Q. Now, I will ask you if at that time either Kline or Westen were interested with you, directly or indirectly, in acquiring the option? A. Absolutely no. I didn't know Kline at that time and I have never discussed the matter with Westen. Q. Mr. Hedges, I will ask you if you obtained that option for the Odeon before you knew either Mr. Kline or Mr. Westen, and tried to sell it to the Shubert Bros. of New York—tried to sell some of the stock? A. I did try to interest the Shubert Bros. Q. Mr. Hedges, when and under what circumstances did you first meet Mr. Westen and have anything to say to him or he to you relative to this Odeon property. Tell the court fully the circumstances of it? A. Mr. Westen is a tenant of the interest which I represent in the building at the corner of Tenth and Clark avenue. I have occasion to see him from time to time with respect to matters arising out of his lease and the items of rents and

other things. The day after I took this option from Swasey I was in his office by reason of some business arising between us. Mr. Westen and myself for a number of years have been on friendly terms. After we concluded the business of this meeting we engaged in some general conversation. At that time things pertaining to the World's Fair were rife, and Mr. Westen asked me if I was going into any World's Fair enterprise, or anything on the Pike. I told him no, I was already in what I regarded as a World's Fair investment. He says: 'What is that?' I replied: 'The Odeon.' He said, 'Tell me something about it, what is that, what do you propose to do?' I related the facts that I was a stockholder, one of the original organizers of the Odeon Company, that I had just taken an option for sufficient stock which, with what was mine, give me 51 per cent control of it. I had just had a talk with Henry David Savage, the impresario, who was a personal friend of mine, who lives in Boston, and he suggested to me that I could obtain 'Ben Hur' during the World's Fair year, that he thought there would be a great deal of money in the enterprise. . . . He seemed to be very much taken with that statement and wanted to know if he could not buy some stock. I told him that I had 51 per cent of it, he could buy some of my own stock; he asked if I cared to make any proposition. He said, 'What value do you place upon that property?' I said that I regarded the entire property as worth $150,000, and that of my 51 per cent control at $75,000. He asked me about the par value and the number of shares and I told him that the 51 per cent was represented by 510 shares. He said: 'Mr. Hedges, I am in a number of enterprises with Mr. Kline—' Q. (Interrupting) Now, at that time did you know Kline or had you ever heard of him? A. I never heard of Kline until we got into this together. He put down 510 on a piece of paper, figured and divided that by 3 and said to me: '510

divided by three gives 170 shares; I would like you to sell myself and Kline each 170 shares of your holding, or two-thirds of it.' I told him I valued that 510 shares at $75,000, and that if he would pay me $50,000 I would deliver to Kline and Westen 170 shares each. He took the receiver off the hook of his telephone and made an appointment with Kline then and there for a meeting the following day at the Mercantile Club. He told me to be present and to have all the information and data respecting the Odeon that I could bring. As per this appointment we met at the Mercantile Club on the following day. Q. Now, tell the court what occurred there. A. In substance, I went over the transaction as I have just stated and then presented a statement giving the income and expenditures of the Odeon Building for some years back. They went particularly into the matter with me in respect to the financial statement of the Odeon property because at that time we had a note in the St. Louis Union Trust Company, and we expected to sell the ground to the McMillan estate and take back a 99-year lease; to pay off this note at the St. Louis Union Trust Company and to have funds available for certain floating indebtedness and improvements that were necessary. In other words, we were to completely refinance our proposition, thus leaving the company the holders of the leasehold instead of being interested in the fee, as formerly. Mr. Kline said to me, 'As I am not familiar with this matter, you are interested constantly with Mr. Westen, I suggest that you take the matter up further with him and whatever Mr. Westen agrees to pay you for your stock I will pay also.' From that time, for the next two or three days, Mr. Westen and myself met frequently at his office and went over these matters, and about the 20th of the month he told me that he and Kline had come to an understanding that they would not pay me for two-thirds of the 510 shares more than $40,000, and that

if I would make a proposition along the line of $40,000 for two-thirds of my stock, figuring it all on the basis of $60,000, that they would probably accede to the terms of the arrangement. I made this proposition on or about the 20th of February. Q. Now, what afterwards occurred? A. Some few days elapsed and Mr. Westen called me up and suggested that I take himself and Kline out to the Odeon and make a thorough inspection of the property; asked me and Mr. Walker to be present at a certain time on a certain afternoon just prior to the first of March. Q. Who is Mr. Walker? A. Mr. Walker was the secretary and treasurer at that time of the Odeon. Q. Harry Walker? A. Manager of the Odeon, so-called. Q. Now, did you go out there? A. I went out there; I took them all through the property out there, took them into Mr. Walker's office. Q. Tell the court all that occurred in Mr. Walker's office. A. We adjourned across the street to have a high-ball. I then said to Mr. Walker: 'Mr. Walker, I am about to close the option that I have with Swasey for his stock, which, together with mine, as you know, will give me 510 shares. I am about to sell these gentlemen two-thirds of my holding for $40,000. I want them to be thoroughly and absolutely satisfied about this entire transaction; and you tell them everything they want to know and show them everything they want to see.' Q. Now, they went ahead and examined the property, did they? A. Went ahead and examined the property, told me that they were ready to go into the transaction on the basis of the purchase of the stock from me for $40,000; that I should prepare the contract, with the reservation, however, particularly, that this re-conveyance and the transaction in reference to the sale of the ground to the McMillan estate should be first consummated. Q. I now hand you this paper and ask you what this is (showing paper). A. That is the contract that was drawn up the afternoon of

March 2d, after the conversation with Mr. Westen, from whom I obtained the ideas as herein expressed. Q. Now, that was signed by all of them? A. I drew this contract in triplicate, went to Westen's office, signed it in his presence and left a copy for Kline, to be signed by all except me. That is, I signed three contracts and left them with Mr. Westen. Q. And this was returned to you ——. A. (Interrupting) The following day—the next morning.

"Defendant's counsel here offers in evidence the original paper, of which 'Exhibit A' in the answer is a copy, and reads as follows:

*"Exhibit A.*

" 'This contract between Isaac A. Hedges, Edward Westen and William L. Kline, witnesseth: that whereas the said Hedges owns, or has contracted to purchase, 510 shares of the capital stock of the Grand Avenue Masonic Temple and Odeon Building Company, the same constituting a majority of the shares of the said corporation, and whereas it is the desire of all three parties to this contract that they should control and direct the affairs of said corporation and that they should each be equally interested in said corporation.

" 'Now, therefore, it is mutually agreed that the said Westen and the said Kline shall each purchase from the said Hedges 170 shares of said stock, each paying for said stock the sum of twenty thousand dollars in cash. The said Westen and the said Kline each agree to deposit twenty thousand dollars in cash with the St. Louis Union Trust Company to the order of the said Hedges on or before the 5th day of March, 1903, provided that the said Hedges has delivered 170 shares of said stock prior to said March 5th at the St. Louis Union Trust Company for each of the other parties to this contract.

" 'It is further agreed that in the event that the contemplated sale of the property belonging to the

above mentioned corporation, and known as the Odeon Building, on Grand avenue in St. Louis, Missouri, to the McMillan estate for the sum of one hundred and fifty thousand dollars, and the giving back by the said McMillan estate to the said corporation of the lease upon said property for 99 years, at an annual rental of 5% upon the price paid, is not consummated and placed on record before the said 5th day of March, 1903, this contract shall become void; otherwise to remain in full force and effect.

" 'Executed in triplicate this 2d day of March, 1903.

" 'ISAAC A. HEDGES,
EDW. WESTEN,
W. L. KLINE.'

"Q. That interlineation was made before it was signed? A. It was made before it was signed and at the suggestion of Mr. Westen, in. order to make it more thoroughly understood that I was selling him the stock. That is in the duplicate and triplicate also. Q. This interlineation reads: 'Provided the said Hedges had delivered 170 shares of said stock prior to said March 5th at the St. Louis Union Trust Company for each of the other parties to this contract.' And right where the interlineation takes place was: 'The said Hedges agrees that he will at once, as soon as he obtains control of said stock, deliver 170 shares to each of the other parties to this contract.' And that changed it, put it the other way. Now, that was delivered to you on the 2d of March, 1903. A. The day following. Q. Now, Mr. Hedges, to go back to Swasey: I will ask you if you remember when you finally made your closing with him under the option? A. I must explain first that sometime after the 16th of February, some few days, I was called at the Colonial Trust Company on a note of $17,000, signed by Capt. Laird and myself and secured by 100 shares of the Colonial Trust stock, which was hypothecated to

secure the note—this transaction was a speculation we had gone into the year before. The calling of this note prompted me to see Swasey and endeavor to trade in this stock on the option that I had with him on his stock and thus let us out of carrying of the Colonial stock or refinancing that transaction. Q. Now, about when was that, that you took that up with Swasey? A. Sometime about the 20th or 21st of February. Q. Now, tell the court what you did; how you made that deal with Swasey? A. I went to Capt. Laird, who is my associate in the Cupples Block, his chief engineer, and asked him if he would let me handle that matter, and I felt that I could work him out of the Colonial Trust stock venture very nicely. He gave me full powers to proceed and I induced Swasey to accept 100 shares in trade on the option, provided I would guarantee the sale of the stock at a certain price. Q. Now, when was that deal with Swasey closed or in what way was an agreement reached between you? A. It was by agreeing verbally between Swasey and myself a day or two, possibly three, prior to March 2d. The definite contract was entered into with Swasey that morning of March 2d. Q. Now, I will ask you whether Kline or Westen had anything to do, directly or indirectly, with that deal with Swasey at that time? A. Absolutely nothing whatever. Q. I will ask you if your respective dealings with them had anything to do with the acquiring of that stock? A. Nothing whatever. I had determined to take that stock of Swasey at all hazards and had made arrangements accordingly. Q. Now, at that time the matter of the McMillan estate was all fixed up? A. About to be closed. Q. What did you do in order to acquire the Swasey stock? A. I had a talk with Thomas H. West and Mr. Filley, the president and secretary of the St. Louis Union Trust Company, immediately after closing with Swasey and giving him my note for $1000 to bind the bargain. Q. (Showing paper) That is your

check there? A. That is the check given to Swasey at his office the morning of March 2d.

"Mr. Howe: I offer the check in evidence. (Reading check): 'St. Louis, Mo. 3-2, 1903. St. Louis Union Trust Company, Pay to the order of W. Albert Swasey, one thousand dollars ($1000) Isaac A. Hedges.' Marked 'Paid, St. Louis Union Trust Company,' through the Clearing House. On the back: 'Pay American Exchange Bank. W. Albert Swasey,' and which went through the Clearing House on the 3d.

"Q. Now, that $1000 was paid—state the circumstances? A. It was paid to W. Albert Swasey to buy 460 shares. Q. You said something about binding the bargain? A. To bind the bargain, I meant, with him. Q. You had an agreement with him? A. Yes, sir. Q. Tell the court exactly what your agreement with Swasey was? A. That he was to receive $20,000 in cash—$1000 on account, $19,000 in cash and 100 shares of Colonial Trust Company stock. Q. Clear? A. Clear. Q. You said something about a guarantee? A. And I guaranteed it; I gave it to him the next day, but it was understood at that time that I would protect the stock; would guarantee the stock would not sell for less than $210 for six months or so. Q. Now, that stock was paid in; what did the stock stand you? A. It stood Capt. Laird and myself at over $230. We had paid the year previous for it $230 and carried it one year, paying 6 per cent interest on the indebtedness. Q. Now, you finally closed that deal with Swasey when? A. The 3d. Q. The 3d of March. I will hand you two checks, one for $14,000, one for $5000, and ask you what they were for? A. One given for $14,000 on the St. Louis Union Trust Co., dated March 3d, for certified check. Another check of the same date for certified check to my order. These two checks, amounting to $19,000, I turned over to W. Albert Swasey. Q I will hand you this check

here dated 3-3, 1903, for $17,000, and ask you what that was? A. Another certified check payable to my order which was turned over to the Colonial Trust Company to release the stock which was securing the loan of Capt. Laird and myself, the debt on that 100 shares of Colonial Trust stock. Q. You then turned the stock, together with the money and your note for $1,000, over to Swasey? A. Yes, sir. Q. I understood you that afterwards you paid that note? A. I paid the note, a thousand dollars. Q. Now, Mr. Hedges, you made a loan, borrowed money at the St. Louis Union Trust Co. on the 3d of March, 1903, did you not, $40,000? A. Yes, sir. Q. I will show you a memorandum and ask you if that is what you placed as collateral for that loan (showing paper) A. Yes.

"Mr. Howe: I offer in evidence that memorandum (reading):

"'Memorandum of demand loan to Isaac A. Hedges, dated March 3, 1903, $40,000. Secured by the following collateral:

| | |
|---|---:|
| Park Bonds, par value | $12,000 |
| U. S. 4% bonds, par value | 7,000 |
| Stock of the Odeon Co., par value | 38,900 |
| Note of James C. Hedrick | 3,750 |
| Deed of Trust for | 3,250 |
| Also contract between Isaac A. Hedges, Edw. Westen and W. L. Kline | 40,000 |

'This note was repaid March 5, 1903. A. W. Alexander, Note Teller.'

"Q. (Handing paper): I hand you a check dated 3-5, 1903, and ask you what it is for? A. It is interest on the $40,000 for three days at 5% from March 3d to 5th, inclusive. Q. That is for the $40,-000 that you borrowed? A. Of the St. Louis Union Trust Company.

"Mr. Howe: I offer the check (reading): 'St. Louis, 3-5-1903. St. Louis Union Trust Co. Pay to the order of Interest, sixteen and 67-100 dollars ($16.67). Isaac A. Hedges.' On the back of it: 'Interest $40,000 three days, 5% March 3d to 5th.'

"The Witness: That is my memorandum on the back; I just figured it out.

"Q. Now, I will ask you to tell the court how you came to borrow that $40,000 and what you did with it? A. I needed $20,000 to discharge my obligation to Swasey, and $17,000 to discharge the obligation of Capt. Laird and myself at the Colonial Trust Company. I knew that in all probability Mr. Kline and Mr. Westen would pay me $40,000 for my stock, and as I could make use of $3000 conveniently at that time I borrowed the sum of $40,000. Q. Now, the whole matter was closed up with Kline and Westen on the basis of this contract? A. Absolutely."

Plaintiffs' objection as calling for the conclusion of the witness sustained by the court.

"Q. Now, Mr. Hedges, I will ask you to state if you—state the circumstances of the issuing of the stock and transferring of it from Swasey to yourself and to these gentlemen? A. I met Swasey on the 3d at the St. Louis Union Trust Company and went with him with the certified checks to one or two different banks where he had his stock hypothecated. I returned after receiving the stock to the St. Louis Union Trust Company and left the stock indorsed in blank by Swasey and his wife with Mr. Filley with the statement that in the morning I would have the stock made out to the respective parties as per the escrow agreement, inasmuch as Swasey had told me that the ground deal with the McMillan estate had been consummated and that Kline and Westen were bound by the terms of their contract. Mr. Walker brought the stock book

the next morning and with him—I had him make out the certificates.

"Q. (Showing stock book): I will ask you to turn to those memoranda (showing also bank book)? A. March 4, 89 shares, Isaac A. Hedges. Received 30 shares, John A. Laird, received by me. 170 shares by Edward Westen, signed for by me. 170 shares W. L. Kline, also signed for by me. Q. Now, that record was made there at that time? A. Yes, sir.

"Mr. Howe: I offer in evidence these stubs.

"Q. Now, I will ask you whether or not it is a fact that the stock was transferred directly from Swasey to these gentlemen as a matter of convenience for banking purposes? A. Purely a matter of convenience; there was no sense in transferring the stock to me and I making different certificates. Another memorandum was made and Swasey and his wife made them as per the escrow agreement.

"Mr. Howe: I offer in evidence the stub.

"A. (Continuing) 89 shares to Isaac A. Hedges, transferred from Irene McL. and W. A. Swasey.

"The Court: Those have all been read.

"Mr. Howe: They may be considered read then.

"The Court: They were all read, Mr. Allen read those.

"Q. Now, the 30 shares transferred to John A. Laird, that transfer, what was the occasion for that? A. In payment for his interest or his equity in the Colonial stock with me. Q. Now, I will ask you if Kline and Westen discussed that matter with you, of his having 30 shares and going on the board? A. Oh, yes, indeed; I told them that there was a stock trade involved in my taking the 460 shares from the parties from whom I was to buy it; that Capt. Laird, my associate, whom Westen knew very well, had an interest with me, and that he was to get 30 shares; that he was a very nice, pleasant gentleman and a very fair-minded

man, and he would act with us in carrying out the policy for the World's Fair period as I had outlined. Q. When did Capt. Laird go on the board? A. At once. Q. Now, I will ask you for those letters,—first, Kline and Westen went on as directors about when? A. At the annual election early in January, 1904. "Q. I will ask you if it is not a fact those records have been open all the time for exhibition to anyone who wanted to see them? A. Everything has been open. Q. And either Kline or Westen could have seen where this stock was transferred, where they got it, at any time in the past three years, could they not? A. It was discussed around the board while they were present. Q. Then, they knew themselves when you had gotten this stock and from whom shortly after you got it, or could have known by looking at the stubs here? A. Of course, of course."

The following letter was introduced for the purpose of affecting the credibility of the witness Swasey.

"Q. I hand you a letter dated October 5, 1906, New York Office, signed W. Albert Swasey, and ask you to state if you got that letter from him? A. This is 'July 5th.' Q. Of July 5th? A. I received this letter from Mr. Swasey.

"Mr. Howe: I offer the letter in evidence.

"Q. Prior to this letter you had received a letter from Bond, Marshall & Bond, asking you to call there and explain this matter? A. Yes, sir.

"Mr. Howe: I will read the letter (reading):

" 'New York Office, July 5, 1906.

" 'Isaac Hedges, Esq.,

" 'Cupples Station, St. Louis, Mo.

" 'My dear Hedges: For several months past I have been urged by friends to bring suit against you for the difference between the amount I received for my Grand avenue and Masonic Temple and Odeon Building Co. stock, and the amount which you received for it from the parties who, I understand, were

interested with you in the transaction. Not wishing to pass on the matter myself, or to accuse you unjustly, I finally consented to submit the matter to my attorneys, Bond, Marshall & Bond, requesting them to look into all the facts, and after an interview with you, to report to me their opinion. I have just received their letter, in which they state they "do not believe I have a cause of action or claim against you arising out of that transaction."

" 'As our relations in the past have been on a perfectly friendly basis, and having no wish myself for any other relations, I am sending you this letter, in order that you may understand the reason I had for taking this preliminary step.

" 'Let me know if you are still interested in the Garrick theater matter, as I have very favorable reports to make to any prospective purchaser.

" 'Very truly yours,

" 'W. Albert Swasey.'

"Q. I understood you to say that you never at any time told Swasey that you had two persons interested with you in the purchase of that stock? A. I did not. The first intimation Swasey had from me is when he signed the stock certificate to those gentlemen."

Capt. John A. Laird testified that he and Hedges were interested in the Colonial stock that was transferred to Swasey; that he received 30 shares of the Odeon stock from Hedges through this deal of Colonial stock. This 30 shares was a part of the Swasey stock which Hedges received.

Hampden D. Mepham testified that he had a conversation with Westen at Westen's office during the month of January of this year.

"Q. Now, I wish you would tell the court just what occurred there? A. One of the reasons for calling on Westen was in connection with being engaged

in a matter he was interested in; I knew him perfectly well. After concluding the business we were interested in in this connection, we discussed the matter of the contemplated suit against Hedges. Mr. Westen, among other things, stated at the time that he was entirely satisfied with the manner in which the Odeon transaction had been consummated, that he had received all he thought was due him. After that conversation said that he was only forced to signing a certain memorandum or paper at the Mercantile Club. I think he gave Kline's name as well as Oppenheimer's as having presented the paper to him on that occasion, and the purpose of which he did not fully comprehend, but that he had signed that paper. It was owing to that he said that he had any connection in any contemplated suit against Hedges. He further stated that so far as he individually was concerned, he liked Mr. Hedges very much indeed, and thought he had a very charming character, that he would never be willing to do anything to harm Mr. Hedges's character in the city of St. Louis.''

Counsel for defendant read the following extracts from the deposition of plaintiff Kline, previously taken, for the purpose of affecting his credibility as a witness:

"Q. You can read and write, can you? A. Yes, sir. Q. Now, I will ask you if this is not your signature (showing paper to witness). A. Yes, sir. Q. Did you sign that [Mr. Howe showing 'Exhibit A' to defendant's answer?] A. Yes, sir. Q. Did you know what was in that when you signed it? A. I don't remember signing it. Q. You are forgetful about it? A. I certainly signed it, and I supposed at the time Mr. Hedges wanted to bind me and Edward Westen to take that stock when he got it, and he conducted the negotiations for getting the stock for us. Q. You didn't read it? A. I must have read it. Q. Then

you did know its contents at the time of signing it? A. Yes, sir. Q. It appears it is executed in triplicate the 2d day of March, 1903. A. Yes, sir. Q. And it further says [reading contract considered read] you bought the stock from him? A. After he got control of it. Q. He put up his money for it? A. I didn't know that. Q. Now, how is it that you came here over three years after this transaction has passed into history and claim that you were in partners with Mr. Hedges when on the very day you made the deal you say you bought the stock of him? A. Well, the three of us bought the stock. Q. But you didn't say that over your signature here? A. Well, we understood that, I don't know why. Q. You said that over your signature on the 2d day of March, 1903. Now, why do you change your statement to-day, almost four years after this transaction has been consummated? A. Well, I presumed the deal was on the square, that Mr. Hedges was telling us the truth, that he was going to put up $20,000 with us and paid very little attention to that paper. I didn't suppose that it was to be used for any litigation by Mr. Hedges. I don't remember signing the paper. I placed so little importance to it anyhow. Still, if you want to know why—Q. I am not asking that. Didn't you make a large profit on it? A. Yes, sir. Q. Then you were not flim-flammed? A. Yes, sir. Q. How so? A. Because we should have made one-third more. Q. How is that possible? A. Because the stock Mr. Hedges had should have been ——. Q. You bought this stock from Mr. Hedges? A. Bought it through him. Q. Have you got one scratch of a pen that substantiates you in such a statement. A. No, sir. Q. The fact is, you, yourself, know very little about this matter. A. I was trusting to Mr. Westen. He said that Mr. Hedges was honest, that he had known him for many years, and any statement he made could be relied on. Mr.

Hedges showed me books that showed a very nice profit. Q. And you got a nice profit? A. We got a profit.''

"Mr. Howe: Now we pass that part of it and go to the paper presented by Mr. Oppenheimer, that there is question about.

"Q. You talk about flim-flamming you, now as a matter of fact haven't you flim-flammed him about this matter? A. I think not. Q. On the 19th of December, 1905, didn't you try to induce Mr. Hedges by secret methods to compel him to give you more money than you in fact was entitled to, or that you would expose him in these matters? A. I did not. Q. Did you ever see that paper (showing paper)? A. I did. Q. You signed a copy of it? A. Yes, sir. Q. You authorized your attorney to deliver it? A. Yes, sir; I did; at the suggestion of the attorney. Q. Now, this is your attorney's fault, not yours? A. I signed that at the advice of my attorney. Q. And didn't you threaten Mr. Hedges that if he did not pay you this money you would expose him? A. No, sir. Q. And tried to blackmail him? A. No, sir; Mr. Hedges came to my place to explain his position in the Odeon sale. He came with Mr. Rosentretter and in the conversation he admitted to me that he had made a profit of $20,000 or near to $20,000 less $5000 he gave to Rosentretter, and showed the check of $5000 to Rosentretter, and he said as we were acting as partners he was willing to divide that $20,000 with Mr. Westen and I. I said if it was shown that it was not profits that belonged to the company, but was commission for the sale, and if the stockholders had no claim on these profits I would accept for Mr. Westen and myself a partition of three in those profits, but if it was shown that the profits belonged to the Odeon Company, that we could not under any circumstances accept it. I saw Mr. Oppenheimer two or three days afterwards

and Mr. Oppenheimer agreed to sign that paper. I told him I didn't think it was necessary at that time, and he said that it was a legitimate claim, and that we had a right to sign it, and upon his advice I signed the receipt, which is for one-third of $20,000 Mr. Hedges claimed he had made by the deal. Q. You say that was a few days before—was this when you saw Mr. Hedges? A. No, sir; it was brought to me by Mr. Oppenheimer after my conversation with Mr. Hedges. He saw Mr. Oppenheimer who was representing me, and Mr. Oppenheimer brought that to me to sign."

"Mr. Howe: I will also offer and read in evidence from page 21 of the deposition of Edward Westen.

" 'Q. Have you changed your name since coming to this country? A. Yes, sir. Q. Your name was Egidius? A. Yes, sir; and still is.

" 'Mr. Howe: That was a change from the original—Sokele? A. Yes, sir. Q. How came you to change it? A. Well, the American people couldn't say the name at all. Q. You changed it when you left Europe? A. Yes, sir. Q. Is that your signature (referring to Exhibit '1')? A. Yes, sir. Q. You can read and write? A. Yes, sir. Q. Understand the English language? A. Well, pretty near. Q. You knew what was in this? A. Yes, sir. Q. You scanned it carefully? A. Yes, sir. Q. You knew it said you were purchasing some stock from Mr. Hedges, didn't you? A. Well, yes; yes, sir, according to my understanding. Q. You knew that this said that you were purchasing some stock from Mr. Hedges? A. Yes, sir; but I knew, I just meant, of course—Mr. Hedges brought that document to the Club, you understand, and I always since I know Mr. Hedges had a high opinion of him and signed it without any question. Q. Didn't you have him write in that memorandum in these, in this interline, "Provided that the said Hedges has de-

livered one hundred and seventy shares of said stock prior to said March 5th at the St. Louis Union Trust Company for each of the other parties to this contract?'' You had him write that in there? A. I don't know; maybe Mr. Kline had him write it in there. Q. Your memory is very bad? A. On the contrary I got a very good memory for everything. Q. You don't remember about this? A. Because I told you before, I had the highest opinion of Mr. Hedges and I would sign anything he puts before me. Q. You say you read it? A. I did. Q. And you forget what it said? A. Yes, sir. Q. But when you heard that Mr. Hedges had made some money in the Odeon transaction you remembered what it didn't say; that is to say, your mind then became acute upon the fact that Mr. Hedges had purchased this stock, not for himself and on his own account, but as your agent?

'' 'By the commissioner: Do you understand the question? A. I never thought for one moment that Mr. Hedges was acting as agent for me, Kline or anybody. Q. He was not then acting as agent? A. According to his offer he was not acting as agent, he was just trying to do a good thing as a friend. Q. Then, this is all right, you made money out of it? A. That didn't amount to anything, what we made in that Odeon. Q. Then, you say point-blank Hedges was not your agent in the transaction. A. No.

'' 'Mr. Howe: But he wrote in, after advised by his counsel, ''Acted as our partner.''

'' 'Q. Certainly not? A. Yes, sir. Q. And he was acting in his own capacity? A. Well, do you want to know how? Q. I say Mr. Hedges was acting in his own capacity for himself? A. For himself.

'' 'Mr. Howe: And interlined, ''I mean he done the work.''

'' 'Q. Was or was not Mr. Hedges acting independently and for himself in the purchase of that

stock? A. Well, I really don't know what kind of an answer I could give you. Q. You don't? A. No, sir. Q. He was not acting for you? A. No, sir; he was not acting for me.

" 'Mr. Howe: And changing it he adds: "He was acting for all three of us."

" 'Q. Well, now, isn't this a fact that this recites the truth of this matter?

" 'Objection sustained by Commissioner.

" 'Q. You have seen this contract? A. Yes, sir. Q. That I am now holding in my hand? I don't want to confuse you? A. No. Q. It recites or sets out a certain state of facts? A. Yes, sir. Q. Is it not the fact that those are the truth of this transaction and the way it was consummated? A. Well, I only know one thing. Q. You can answer that? A. I have to examine that. After Mr. Hedges had a conversation with Mr. Kline and me in the Club, you know, then I turned the matter over to Mr. Kline and he investigated the Odeon. You understand Mr. Kline did, because I trust Mr. Hedges. If he had asked me for more money, only I wanted Mr. Kline to convince him on that subject, if that would be a good investment. Now, that was the second or third time when Mr. Hedges came in the Club. Then he brought that document along, it was not written. Mr. Hedges wrote that at home and he brought it to the Club for us to sign. . . . Q. At the time you got this up (Mr. Howe showing document) were you not threatening Mr. Hedges with all kinds of charges that you would place against him if he didn't pay you this money? A. Well, that was not directly me, you know. Of course, I didn't think I done anything against you, did I (referring to Mr. Hedges)? Q. Didn't you try to get this money out of him covertly?

" 'Objection sustained by the Commissioner.

" 'Q. Whatever was due was due you as stockholder in the Odeon?

" 'Objection sustained by the Commissioner.

" 'Q. Then you were willing to go on record and make the statement that Mr. Hedges sold the property for $105,000 if he would pay you the $6,666.66. A. No, sir.' "

Defendant Hedges was re-called and testified as follows:

"Q. Now, I will hand you a letter, dated St. Louis, October 18, 1905, and ask you what it is? A. A letter from Jacob Oppenheimer to me.

"Mr. Howe: I will offer this letter in evidence (reading):

" 'October 5, 1905.

" 'Isaac A. Hedges, 211 S. Seventh Street:

" 'A claim has been placed in my hands against you, particulars of which it would be impossible for me to give you by mail. Therefore, request you to make appointment to meet me at my office as soon as possible and oblige.

" 'Yours truly,

" 'JACOB OPPENHEIMER.'

"Q. Now, in response to that letter what did you do? A. I wrote the gentleman a letter. Q. Then what did you do? A. My carbon is here. I suggested that if he had any claim against me to come and see me and discuss it. Q. I have got the carbon? Did you go to see him? A. I did not. Q. Did you receive any more letters from him? A. I did, and telephone calls. Q. Did you have any talk with him over the telephone? A. Yes. Q. What did he say to you? A. He said he would like if I could call on him; he could not give the details over the telephone even. He urged me strenuously to come to his office if I wished to avoid trouble. Q. I show you here the letter dated November 27, and ask you if you received that letter (showing paper)? A. I did.

"Mr. Howe:  I will read it.

"Mr. Allen:  Read it.

" 'St. Louis, Nov. 27, 1905.

" 'Mr. Isaac A. Hedges, City.

" 'Dear Sir:  I tried to get you over the phone several times, also left word to have you call me up, but have not heard from you.  I investigated the offer which you made for the 225 shares of Washington National Bank stock belonging to my client and find that we can not make a deal for the note and deed of trust which you offered, for the reason that, on investigation, I find that we could not dispose of them at once; therefore, they would be of no value to my client, as it is cash that we need.

" 'I would like to have you call and see me, as a client of mine has placed a claim in my hands, alleging that there is some money due him on the sale of the Odeon Theater building, he being a stockholder of the former company, which owned said building.

" 'Yours truly,

" 'JACOB OPPENHEIMER.'

"Q.  What did you do then, Mr. Hedges?  A.  I did nothing.  Q.  Did you receive any more calls?  A. I received a call from a gentleman I see sitting over there (indicating Mr. Gallant).  Q.  At your office? A.  At the Washington National Bank.  Q.  Did he say who he was sent by?  A.  He said that he had a desk in Mr. Oppenheimer's office and that he suggested that I had better see Mr. Oppenheimer, that he had some very glaringly sensational charges embodied in a suit which he proposed to bring against me.  I asked this gentleman whom he was representing.  'Why,' he said, 'Mr. Kline and Mr. Westen.'  That was the first intimation I ever had as to the purpose back of these letters.  I at once called up Mr. Kline and Mr. Westen.  Q.  Did you receive another letter from Mr. Oppenheimer, written you under date of December 8, (showing paper)?  A.  Yes, sir.

"Mr. Howe: I offer it in evidence (reading):

" 'St. Louis, Dec. 8, 1905.

" 'Mr. Isaac A. Hedges, City.

" 'Dear Sir: Mr. Gallant mentioned to me that you was willing to call and see me relative to claims which I hold relative to the Odeon Theater building. My clients are exceedingly anxious that I close this matter up at once, and, therefore, would thank you very much to call and see me immediately so that I can learn from you your side of the matter, in order that I may lay both sides before my clients, to give them an opportunity to decide what they intend to do in the matter.

" 'Yours truly,

" 'Jacob Oppenheimer.'

"Q. Then, what did you do? A. I called up Mr. Oppenheimer on the phone and suggested that we meet at the Missouri Athletic Club. Q. Did you receive any more letters from him? A. Yes, sir.

"Mr. Howe: I will read it (reading):

" 'St. Louis, Dec. 15, 1905.

" 'Mr. Isaac A. Hedges, City.

" 'Dear Sir: Messrs. Kline and Westen have requested me to defer our matter until next Monday on account of request you made, so as to give you an opportunity to close your Ferry deal. I will see you at the club between 12:30 and 1 o'clock, unless you call me up and make other arrangements. If possible, think this matter over and let us be prepared to make a final settlement at that time.

" 'Yours truly,

" 'Jacob Oppenheimer.'

"Q. Did you ever meet with him? A. I did. I had also seen Mr. Kline and Mr. Westen in the interim. Q. State what occurred at this meeting. You had seen Kline and Westen, together or separately? A. Separately. They had kept me going to and fro like

a battledoor and shuttlecock. I wanted to explain the misunderstanding under which they labored; that I had done them no injustice, either in the purchase or sale in this transaction, but they would each refer me kindly to their attorney. Q. Then you had further talk with their attorney? A. I did. Q. Now, what did you do there? A. Well, I realized that I was in the hands of the Philistines.

"Mr. Allen: Tell what the Philistines did. A. (Continuing) They tried to make me pay them money. I laid the entire matter before my neighbor, Alexander G. Cochran. He told me to fight for my life.

"The Court: After you had Bond, Marshall and Bond's legal advice, Alexander .G. Cochran's expert advice, was there any other lawyer? Let us get at the facts.

"Mr. Howe: That is what I am getting at.

"Q. Tell what occurred between you and Mr. Oppenheimer? A. Mr. Oppenheimer, after looking over all my proof and my position in these suits that were threatened, told me that what these men wanted was money and not explanations. Then I said to him: 'Then as a matter of fact, they are accusing me of something, although they are perfectly willing to divide?' He said, 'Yes.' I said: 'What do you think about it?' He said: 'I don't think you have done them any wrong, but,' he said, 'they want money.' I said: 'Can you get a proposition from them?' He said: 'I think I can.' 'Well,' he said, 'it is patent to you that if those notes that are involved are paid at the end of three years, you will make about $20,000.' I said, 'Yes.' And he said: 'I think they would be satisfied if you paid them two-thirds of that amount.' I had started out to go away, when I said: 'I would like to see something in writing stating that, Mr. Oppenheimer.' He said: 'I will bring you the papers to-

morrow.' I said: 'I wish you would bring me a paper stating your position also, that I may take the matter under advisement.' Q. I will ask you if anything was said there about how these suits would involve you personally, ruin your chances of political preferment? A. Yes, sir; there were quite a few things said. Q. Just state what he said about that? A. He said: 'Mr. Hedges, you don't know me very well, just two or three meetings, but I know you. I see you on the third floor of the Commercial Building nearly every day in conjunction with Jeptha D. Howe; I know the work you are engaged in, the rehabilitation of the Republican party; I have heard some rumors connecting your name with the mayoralty. You must realize it would be a mistake for you to permit anything to get out in the papers regarding you.' Q. Did he produce, the next day? A. The next day he produced the papers. Q. Did you see them signed by Kline and Westen? A. I saw the original and he gave me this carbon I requested him to furnish me to take it under advisement. Q. Now, you never made any proposition of that kind to them? A. I did not. Q. You simply —— A. (Interrupting) I simply led him on, said I would take it under advisement.

"Mr. Howe: I offer in evidence Exhibits '1' and '2,' Exhibits '1' and '2' heretofore read in examination, each dated October 11, 1903."

*" 'Exhibit 1.*

" 'For and in consideration of the sum of $6,666.66 to each of us in hand paid by Isaac A. Hedges, the receipt whereof is hereby acknowledged, we do by these presents release and relinquish all claims which we or either of us now have, or might hereafter have on account of any and all profit which he, said Isaac A. Hedges, might have made on account of the sale of the building known as the Odeon Theater and Masonic Temple in the City of St. Louis, Missouri.'

" 'Exhibit 2.

" 'Whereas, Isaac A. Hedges, acting for the Grand Avenue Masonic Temple and Odeon Building Company, a corporation, sold, by and through one L. M. Crawford to David Rosentretter, the property belonging to said corporation for the sum of one hundred and five thousand dollars ($105,000), and whereas, it was understood at the time of the transaction that said Hedges was to receive cash for the transfer of said property, and, whereas, after deed to said property had been made, the purchaser delivered to said Hedges the sum of seventy-five thousand dollars ($75,000), in cash, and, whereas, he failed to pay the balance in cash and offered said Hedges certain notes of the Wilson Investment Company at a discount, and whereas, said Hedges did accept certain notes and disposed of the same so as to make up the amount of one hundred and five thousand dollars ($105,000) belonging to the corporation, and, whereas, said Hedges was compelled to pay to L. M. Crawford one of said notes amounting to twelve thousand five hundred dollars ($12,500) as had been agreed upon as commissions to said Crawford, also a commission to said David Rosentretter on account of the sale of said building; now, therefore, I, the undersigned, attorney at law of the city of St. Louis, Missouri, having made an investigation of the entire transaction, am thoroughly convinced that the sale price of said Odeon Theater and Masonic Temple building, for and on behalf of the corporation for which said Isaac A. Hedges was acting, was disposed of for the sum of one hundred and five thousand dollars ($105,000) and no more. This statement of facts is given to said Isaac A. Hedges by me after full and thorough investigation, and after being fully convinced of the facts herein set forth on my part.

" 'In witness whereof, I have hereunto set my hand, this 19th day of December, 1905.

" 'Jacob Oppenheimer.'

"Q. I understand that they were given to you by Mr. Oppenheimer? A. They were. Q. Now, Mr. Hedges, did you at any time state to either Kline or Westen that you were going to pay $60,000 for that stock, and going out to buy it? A. I did not; $60,000 was mentioned as the basis of the value of my 51 per cent."

It was stipulated between the parties to the suit that the issue, whether or not the defendant is liable to account, shall be the only issue tried at the hearing in the circuit court; and that if the court found against the defendant on that issue, then the question of the amount for which the defendant should be liable should be reserved and be determined by the court at a future hearing.

Whatever additional facts that may be necessary to shed light upon the legal propositions involved will be stated in the opinion in connection with the discussion of those propositions.

I. The record in this case shows that at the time of the rendition of the decree herein the learned judge who tried the cause used the following language:

"The court has concluded in the determination of the issues in this case that they depend entirely upon the court's conclusion as to the facts. I think on the question of law there will be no dispute, and I think both sides have correctly stated the law if their view of the facts were adopted. The court determines the case not without some doubt.

"The plaintiffs in the case charge that defendant Hedges, while acting for them, purchased certain

shares of stock of the Odeon Building Company from
W. Albert Swasey, and that out of the purchase he
made a secret profit; that he should be made to dis-
gorge the profit that he made out of the distribution
and conveyance of the stock to them; defendant tak-
ing the position that in purchasing the stock in con-
troversy he did so on his own account and that his
subsequent conveyance of the stock to plaintiffs was
a re-sale.

"The burden in the case is of course on the plain-
tiffs, to establish the confidential relation, which is
denied. While there is a great deal of testimony
which tends to corroborate the evidence given by the
plaintiffs, there are also attending circumstances
which tend to corroborate the testimony of the defend-
ant. The testimony of the plaintiffs and of the de-
fendant are in direct conflict and after being some-
what embarrassed in the determination of the ques-
tions of fact, the court has concluded that the written
agreement signed by both parties introduced as 'Ex-
hibit A' has determined the questions of fact, and
when placed in the scale turned the balance against
plaintiffs. The questions of fact are simple, there is
nothing complicated about them, it is simply a ques-
tion of the weight of the evidence and the court, not
without embarrassment in determining this issue, has
concluded that the plaintiffs have not sustained the
burden which is upon them, of proving their case by
the greater weight of the evidence. So that, the bill
of plaintiffs will be dismissed."

The foregoing observations of the trial court
clearly show not only the issues tried and the conclu-
sions reached, but they also show the means by which
it reached those conclusions, and the weight it gave to
the testimony of the witnesses.

After a very careful reading of this entire record,
we fully concur in the views of the circuit court to the

effect that the determination of this case depends
largely upon the conclusion of facts; and that there is
little, if any, difference in opinion between counsel as
to the law applicable to the facts whichever way they
may be determined.

We, also, concur with the circuit court in finding
that the testimony of the plaintiffs upon every material fact is in direct conflict with that of the defendant. This condition of the case necessitates the calling
to our assistance all the side light that the facts and
circumstances of the case will shed upon the issue,
which, by the stipulation before mentioned, was submitted to the court.

The burden of proof rested upon appellants to
prove their case, and that their testimony made out a
prima-facie case is not and cannot be disputed; and
if their testimony constituted all of the evidence that
was introduced in the cause, then we would have no
difficulty whatever in holding that they were entitled
to a recovery. |Unfortunately, however, for them,
that was not all the evidence introduced. The respondent's testimony, as before stated, was in direct
conflict with that of appellants, and he testified positively and unqualifiedly that he owned fifty shares of
the capital stock of the company, and purchased the
other four hundred and sixty shares mentioned on his
own account, and not for the joint account of himself
and them, as they contend; and sold to each of them
one hundred and seven shares for the sum of $20,000,
or $40,000 for the three hundred and forty shares sold
to the two.

Now, what are the facts and circumstances of the
case that lend support to the respective claims of these
litigants? We will consider first those relied upon by
counsel for appellants.

First: Swasey, the person from whom respondent purchased the four hundred and sixty shares, tes-

tified, as appellants did, that respondent told him that he was buying the stock for the joint interest of himself and the appellants, and that they wanted to acquire a majority of the stock and thereby control the company and its business affairs—he to be president and they to be elected directors.

Second: That immediately following that statement made to Swasey, respondent perfected the arrangement with appellants by which each of them agreed to, and did, take one hundred and seventy shares of said stock, each paying therefor the sum of $40,000, and received a certificate of stock issued directly from Swasey and not from the respondent.

Third: That in pursuance to their joint arrangement, respondent was elected president of the company and appellants were chosen directors thereof, and conducted the business of the company in pursuance to their previous arrangements.

Upon the other hand, counsel for respondent marshal the following disclosures, made by the record, as corroborative of his theory of the case:

(a)   That the record wholly fails to disclose any confidential relation of any character existing between respondent and appellants at the time of, or prior to March 2, 1903, the date of the written contract, made and entered into by and between them regarding the purchase of this stock.

Respecting that matter, the record shows that respondent never knew, or heard, of appellant Kline prior to the date when the former spoke to appellant Westen about the purchase of this stock, which was but a few days prior to the execution of said contract. Upon that occasion Westen mentioned Kline to respondent as a person who would probably desire to become interested in the purchase of this stock. That while still discussing the matter, Westen called Kline up by telephone and made an engagement with the lat-

ter to meet him and the respondent at the Commercial Club the next day to talk over the enterprise. From this, it is clear, in so far as Kline was concerned, that there was no confidential relation existing between him and respondent which induced the former to rely and act upon the representations and statements of the latter touching the project, or that could have induced Kline to have signed the contract made between them without first having known its contents. And as to appellant Westen, the record discloses that the only relation that existed between him and respondent at that time was a business relation of a very limited character, namely, that Westen was and had been for several years a tenant in a building which was controlled or managed by respondent and others, but the exact nature of respondent's interest therein is not made clear. That was not such a confidential relation existing between them, that the law recognizes as being sufficient from which to raise a presumption that Westen was thereby subjected to the domination and undue influence of the respondent, and which destroyed his will power, or deprived him of the free exercise of his independent judgment in entering into the contract for the purchase of the stock mentioned in the evidence.

The burden of proof was not, therefore, shifted to respondent to show that the contract was honestly and fairly entered into and executed, but the burden, as before stated, rests upon appellants to show that the respondent by dishonest means gained an unfair advantage over them in the procurement of this stock.

We must, therefore, approach the consideration of this case upon the theory that all of the parties to the transaction were *sui juris,* and dealt with each other at arm's length and upon an equal footing.

(b). It is next insisted by counsel for respondent that the written contract, dated March 2, 1903, en-

tered into by and between him and appellants for the purchase of this stock corroborates his theory of the transaction, and squarely contradicts that of the appellants.

The contract in substance provides that respondent was to procure, with what he then owned, sufficient of the stock to make a majority of the stock of this company, and sell to each of the appellants one hundred and seventy shares thereof for the sum of $20,-000; and that the three would thereby acquire the control of the company—the respondent to be elected president and they were to be chosen directors thereof, the former, at the time, being a director, which fact was known to appellants.

This phase of the contract not only corroborates respondent's testimony regarding the theory of the transaction, but it contradicts appellants' entire theory of the case. And this corroboration and contradiction is emphasized by the fact that when respondent took the contract to appellants to sign, they had him interline therein that he would cause one hundred and seventy shares of the stock of the company to be issued to each of them and deposited for their use with the Union Trust Company before either of them should become bound to pay the purchase price thereof. This interlineation was in perfect harmony with respondent's testimony, which was to the effect that he was to purchase whatever stock was necessary to make a majority of it, upon his own account, and then bound himself to sell to each of the appellants one hundred and seventy shares thereof. If that was not the understanding between them, then why did appellants require the respondent, by the interlineation, to first acquire the stock, have it issued in their names and deposited with the Trust Company for their use before they were to pay for it? If their theory of the transaction was true, namely, that all

three of them were jointly interested in it, or were partners in the undertaking, then there was no more reason for, or duty resting upon, him to purchase the stock and deposit it with the Trust Company for their use than there was for them to have purchased it for him. If all were jointly and equally interested in the entire transaction, then all of them were equally bound to procure the stock, and pay for it and see that it was properly issued and delivered to the proper parties. In which case it would not have been necessary to have deposited the stock with the Trust Company for the use of appellants, or for any one else.

(c) The record also conclusively shows that several days prior to the date on which respondent spoke to appellants regarding this stock transaction, he had procured an option upon the same whereby he was to become the purchaser upon his own account with a view of selling a part thereof to others, and in fact had been trying to sell a part of it to some New York parties before he mentioned the matter to the appellants. And not only that, respondent, in pursuance to the contract entered into between him and the appellants regarding this stock, went to the Union Trust Company and other parties and made arrangements by which to procure the necessary means with which to pay for the stock which he afterwards conveyed to appellants. If all three of the parties were equally interested in the transaction, then why did not all of them attend to those preliminary matters, and why would respondent do so at his own expense and trouble, as the record shows he did? It may be suggested because the appellants had the cash with which to pay for their portions of the stock and respondent did not; but that is no answer whatever, for the reason, according to the contract, the stock had to be procured and paid for by respondent and by him deposited free of all incumbrances with the Trust

Company for their use before they were required to pay their cash, all of which took a large sum of money, and all of which, according to their theory, was to be expended by respondent when it was conceded he did not have it.

(d). Independent of what has been said of the foregoing facts and circumstances corroborating respondent's testimony and his theory of the case, there stands the written contract itself, which speaks in no uncertain terms to the effect that respondent was to purchase this stock and was to pay for the same, have it issued in the names of appellants and deposited with the Trust Company for their use before they were obligated to pay for the same. The plain meaning of the contract is that he was to purchase the stock, and obligated himself thereby to sell to each of appellants one hundred and seventy shares thereof.

That being true, the law presumes that all of the agreement was reduced to writing, which must stand as written until impeached for fraud or some other equitable ground, which clearly has not been done in this case. [Ringer v. Holtzclaw, 112 Mo. l. c. 523; Reigart v. Coal Co., 217 Mo. l. c. 154, and cases cited.]

(e). There is another potent fact to be considered in this connection, and that is, each of the appellants, according to their testimony, retained a duplicate copy of this contract in their possession for more than three years before they discovered the fact that it provided the respondent was to purchase this stock and sell a part of it to them for so much money. As a matter of fact that is not true, for both of them testified that the interlineation mentioned regarding that very matter was made at their suggestion in order that the terms of the contract might be made more definite and certain in that respect. But independent of that, the long delay of the appellants to read the contract, and their enjoyment of the large profits during those years,

which flowed to them under its provisions, do not appeal very strongly to the ear and conscience of the chancellor.

(f). Finally, the questionable means resorted to by appellants to force respondent to settle or compromise this matter before the suit was instituted disclose a moral condition which of necessity must have polluted the testimony of the parties who place a higher value upon the red gold demanded than upon good morals, right and justice. That alone should and doubtless did greatly influence the mind of the learned chancellor who tried the cause below against the justice of appellants' claim.

So, viewing this transaction in the light of the written contract made and entered into by and between these parties, and the facts and circumstances which corroborate the one and contradict the others, we have no hesitancy whatever in saying that in our opinion the appellants not only failed to prove their case, as the law required them to do before they were entitled to a recovery, but that the great weight of the testimony was with the respondent and his theory of the case.

There are some other minor questions discussed by counsel in their briefs, but whichever way they might be determined would not change the result reached, and for that reason we pass them by.

We are, therefore, of the opinion that the decree of the circuit court was for the right party, and should be affirmed; and it is so ordered.

All concur.